ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 28 2018

JAMES N. HATTEN, Clerk
By: BK  Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HYUNDAI CONSTRUCTION EQUIPMENT AMERICAS, INC. | Criminal Information<br><br>No. 1:18-CR-00379 |

THE UNITED STATES ATTORNEY AND THE ASSISTANT ATTORNEY GENERAL OF THE ENVIRONMENT AND NATURAL RESOURCES DIVISION OF THE U.S. DEPARTMENT OF JUSTICE CHARGE THAT:

1. From in or about June 2013 through in our about April 2014, in the Northern District of Georgia and elsewhere, the defendant, HYUNDAI CONSTRUCTION EQUIPMENT AMERICAS, INC. (HCEA), did knowingly combine, conspire, confederate, agree, and have a tacit understanding with two or more natural persons, known and unknown to the United States:

   a. to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating lawful governmental functions of the Environmental Protection Agency, to wit, implementing and enforcing vehicle emissions standards under the Clean Air Act; and

   b. to violate the Clean Air Act, by making and causing to be made, false material statements, representations, and certifications in, and omitting and causing to be omitted material information from,

notices, applications, records, reports, plans, and other documents required pursuant to the Clean Air Act to be filed and maintained, in violation of Title 42, United States Code, Section 7413(c)(2)(A).

## Background

At times relevant to this Information:

2. The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles.

3. The Clean Air Act required the U.S. Environmental Protection Agency (EPA) to promulgate emissions standards for new motor vehicles, including nonroad compression-ignition (diesel) engines.

4. In October 1998, the EPA promulgated new regulations for nonroad compression-ignition engines based on their power as measured in kilowatts. These regulations established emission standards for the first time for engines under 37 kilowatts, and established more stringent standards for engines at or above 37 kilowatts.

5. The EPA subsequently promulgated more stringent requirements for these same engines, known as Tier 4.  These standards were implemented in 2011 for engines in the power range of 130 kilowatts up to, but not including, 560 kilowatts.  The standards were implemented in 2012 for engines in the power range of 56 kilowatts up to, but not including, 130 kilowatts.

6. The EPA regulations included the Transition Program for Equipment Manufacturers (TPEM), which consisted of a number of regulatory provisions designed to provide equipment manufacturers with some flexibility over the transition process to the new standards. Generally, TPEM exempted a limited number of equipment with engines that did not meet the applicable Tier 4 standards from the prohibition against introducing such equipment into commerce in the United States, provided the equipment manufacturer complied with the TPEM regulations.

7. In each relevant power category of engine, the equipment manufacturer choosing to participate in TPEM was required to elect one of two allowances: (1) the Percent of Production Allowance or (2) the Small Volume Allowance. For an equipment manufacturer's U.S.-directed production volume, these two allowances allowed equipment manufacturers to produce, in each power category, a certain number of units with exempted engines subject to less stringent emission standards after the Tier 4 standards began to apply. Once the allowances were exhausted, the manufacturer was required to comply fully with the Tier 4 standards, unless another exemption applied.

8. The manufacturer participating in TPEM was required to notify the EPA whether it intend to comply with the Percent of Production Allowance or the Small Volume Allowance.

9. The manufacturer of TPEM equipment participating in TPEM was required to file annual reports with the EPA that included the following information:

3

   a. The total number of units sold in the preceding years for each power category based on actual U.S.-directed production information; and

   b. The percentages of U.S.-directed production that corresponded to the number of units in each power category and cumulative numbers and percentages (if applicable) of units for all TPEM units sold for each power category.

## Manner and Means

10. Hyundai Heavy Industries Co., Ltd. (HHI), was a company headquartered in the Republic of Korea (South Korea).

11. Defendant Hyundai Construction Equipment Americas, Inc. (HCEA) was a wholly-owned subsidiary of HHI headquartered in Norcross, Georgia.

12. S.M.Y. was the President of HCEA from January 2013 until October 2014.

13. B.J.A. was the North American Sales Manager of HCEA until March 2014. In March 2014, he returned to Korea to work at HHI.

14. J.L. was an attorney retained by HCEA to provide HCEA advice about, among other issues, TPEM and the Clean Air Act.

15. Defendant HCEA hired a consultant to assist it with the TPEM regulations.

16. In June and July 2013, the consultant told Defendant HCEA that HHI was in violation of the TPEM regulations and the consultant strongly recommended that Defendant HCEA not import any additional Tier 3 or TPEM engines. The

4

consultant told an HCEA employee that the violation could result in a penalty of over $13 million.

17. Defendant HCEA disregarded the consultant's advice and instead continued importing and selling equipment, including equipment with TPEM engines in excess of the regulatory allowance.

18. Defendant HCEA violated the Clean Air Act regulations by: (a) importing more Tier 3 and TPEM engines than allowed by the Clean Air Act regulations; and (b) filing at least one annual report with false material information and intentionally omitting material information.

## Overt Acts

19. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Northern District of Georgia and elsewhere:

    a. On or about June 15, 2013, in the Northern District of Georgia, B.J.A. sent an email to multiple HCEA and HHI employees suggesting a strategy to fraudulently avoid detection by the EPA of violations of the TPEM regulations.

    b. On or about June 21, 2013, an employee of HCEA's then parent corporation evaluated and documented potential fines for violations of the TPEM regulations, finding the penalties could range from $29 million to $67 million.

c.  On or about June 25, 2013, in the Northern District of Georgia, B.J.A. created a notification to be submitted to the EPA that was intended to fraudulently hide violations of the TPEM regulations.

d.  In or about the summer of 2013, in the Northern District of Georgia, S.M.Y. authorized the import by Defendant HCEA of 17 pieces of equipment with the higher power category engines, after having been informed that importing that equipment would violate the TPEM regulations.  The 17 pieces of equipment were subsequently imported into the United States and sold.

e.  On or about October 10, 2013, B.J.A. sent an email to certain employees of HHI noting that the 2012 annual report to the EPA was incorrect and that if they had to lie in the future, they would need to have a logical explanation for their decisions in the future.

f.  On or about March 14, 2014, an employee of HHI sent an email to an employee of Defendant HCEA attaching data related to preparing the 2013 annual report to the EPA.

g.  On or about March 24, 2014, an employee of HHI sent an email to an employee of Defendant HCEA attaching prior TPEM notification letters.

h.  On or about March 24, 2014, an employee of HHI sent another email to an employee of Defendant HCEA attaching data related to preparing the 2013 annual report to the EPA.

i. On or about March 26, 2014, in the Northern District of Georgia, an employee of Defendant HCEA sent additional data to an employee of HHI related to preparing the 2013 annual report to the EPA.

j. On or about March 30, 2014, in the Northern District of Georgia, an employee of Defendant HCEA sent an email to employees of HHI attaching data related to preparing the 2013 annual report to the EPA.

k. On or about March 30, 2014, in the Northern District of Georgia, an employee of Defendant HCEA sent an email to J.L. attaching the proposed 2013 annual report to the EPA.

l. On or about March 30, 2014, J.L. sent an email to an employee of Defendant HCEA approving the filing of the 2013 annual report.

m. On or about March 31, 2014, in the Northern District of Georgia, an employee of HCEA sent an email to B.J.A. containing the 2013 annual report.

n. On or about March 31, 2014, B.J.A. submitted the 2013 annual report to the EPA, which contained materially false information and omitted material information related to both the higher and the lower power categories.

All in violation of Title 18, United States Code, Section 371.

JEFFREY H. WOOD
*Acting Assistant Attorney General of the Environment and Natural Resources Division and Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515*

CHRISTOPHER J. HUBER
*Assistant United States Attorney*
Georgia Bar No. 545627

KRISHNA S. DIGHE
*Senior Counsel, Environmental Crimes Section*
Michigan Bar No. P45376

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181